NO.   94-324

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IN THE MATTER OF THE RENEWAL,
OF THE TEACHING CERTIFICATE OF
GERALD  THOMPSON

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Kathleen  F.  Holden,  Special  Assistant  Attorney
        General,  Office of  Public  Instruction,  Helena,
        Montana

        For Respondent:

        Torger S. Oaas, Lewistown, Montana; Elizabeth A
        Best,  Best  Law Offices, Great Falls, Montana

        For Amicus:

        Hon.  Joseph  P.  Mazurek,  Attorney  General,  Kimberly
        A.  Kradolfer,  Assistant  Attorney  General,  Helena,
        Montana  (Board  of  Public  Education);  Janice  F.
        Doggett  (Montana  School  Boards  Ass'n);  Douglas  F.
        Bates,  Salt  Lake  City,  Utah,  (National  Ass'n  of
        State   Directors   of   Teacher   Education   and
        Certification)

FILED

MAR 23 1995

Filed:

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  November 17, 1994

Decided:   March 23, 1995

_____
/Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

The Montana Office of Public Instruction appeals from an Order of the District Court of the Eighth Judicial District, Cascade county. The District Court's Order reversed an Order of the Board of Public Education which denied the renewal of Gerald Thompson's teaching certificate. Nonrenewal was based on the Board's conclusion that Gerald Thompson is not of good moral and professional character because of incidents of sexual misconduct. The District Court concluded that the authorities involved in investigating the allegations of sexual misconduct had actively sought to suppress the truth, that the actions of the County Attorney were "shocking to the conscience" of the court and that Gerald Thompson had been deprived of due process during the proceedings leading up to the Hearing Examiner's decision which was adopted by the Board of Public Education. We affirm the District Court.

The dispositive issues are as follows:

I. Did the District Court err in reversing the Order of the Board of Public Education based on the expert testimony provided by OPI's expert?

II. Did the District Court err in concluding that the Order of the Board of Public Education was not supported by substantial credible evidence?

Gerald Thompson (Thompson) began teaching in 1977. In 1981, he was hired by the Hobson School District to teach, coach basketball, and to be part-time administrative assistant to the district superintendent. He was head high school basketball coach for the boys' team from 1981 until his resignation on December 5,

2

**1988.** He **also coached high school girls'** basketball from 1984 until 1987.  In July 1987, he was promoted to district school superintendent  and he relinquished his  teaching  and girls' basketball  coaching  duties.

In late November of 1988, the Board of Trustees for the Hobson School District (School Board) received two letters alleging sexual misconduct by Thompson. Lisa Killham (Killham), a 1987 Hobson High School  graduate,  signed  one  of  these  letters; K.W., a senior at Hobson High School **at** the **time,** signed  the  other.

The School Board later received two additional claims alleging sexual  misconduct  by  Thompson.   One of these was from a former employee of the school district, Margaret Aamold, alleging sexual misconduct during her employment; the other was from a 1986 Hobson High School graduate,  Tammy  Hutchinson (Hutchinson), alleging sexual misconduct by Thompson after her graduation from high school when she visited him at his home.

Hobson is a community  of less than 250 residents.   The substance of the letters from Killham and K.W. became widely disseminated throughout the **small** community within a period of approximately  forty-eight  hours  after the School Board met to consider what to do about the allegations.   As a result of the allegations becoming widely known in Hobson and the publication of an  article  about the sexual misconduct allegations,  Thompson resigned his position with the  Hobson School District effective December 5, 1988.  His resignation was due in part to the position taken by at least two School Board members who stated their belief

3

that Thompson could not continue to be effective in his position considering the community's division regarding the truthfulness of the allegations made by Killham and K.W.

The Judith Basin County Attorney investigated the allegations on behalf of the School Board. She also referred the matter to the Attorney General's office for a decision on whether to prosecute Thompson for criminal sexual conduct regarding the facts alleged in the claims made by Killham and K.W. Thompson was subsequently charged with two counts of sexual intercourse without consent and one count of attempted sexual contact.

The Office of Public Instruction (OPI) controls the granting and renewal of teaching certificates in Montana. Thompson's teaching certificate expired July 1, 1990, approximately one and one-half years after the first allegations of sexual misconduct came to light. Prior to its expiration, he filed an incomplete application for renewal, indicating that he was awaiting the resolution of pending criminal charges. In December of 1990, the charges against Thompson were dismissed. Thompson then notified OPI of such dismissal.

OPI investigated the matter primarily by obtaining a copy of the Attorney General's file on the criminal charges against Thompson. After OPI's investigation, the Superintendent of Public Instruction denied renewal of Thompson's teaching certificate on May 16, 1991, based on OPI's determination that Thompson was not of good moral character, as required by § 20-4-104(1)(b), MCA.

Thompson appealed OPI's decision to the Board of Public

4

Education (the Board). The Board appointed an attorney as hearing examiner for purposes of the appeal and a hearing was held on April 8-11, 1992. The Hearing Examiner determined that OPI's decision to deny renewal of Thompson's teaching certificate should be upheld because Thompson did not meet the requirement of § 20-4-104(1)(b), MCA, that he be of "good moral and professional character." This conclusion was based on the Hearing Examiner's finding that Thompson demanded and attempted to force Killham to engage in sexual activities with him on December 9, 1986, when she was a student at Hobson High School, and the additional finding that he had made unwelcome sexual advances toward Hutchinson in 1987. In view of the contradictory testimony elicited from various witnesses, we emphasize that the findings were limited to an unsuccessful attempt to force Killham to perform oral sex and a making of unwelcome sexual advances to Hutchinson.

Thompson filed formal exceptions to the Proposed Order of the Hearing Examiner. The Board heard arguments by the parties on January 22, 1993 and subsequently reviewed the entire transcript and all exhibits. On March 19, 1993, the Board voted 5-1 to uphold the findings and conclusions of the Hearing Examiner, adopting them and the proposed order without amendment.

Thompson then appealed the matter to the District Court. The District Court reversed the Board's decision and remanded the matter to the Board, determining that the decision not to renew Thompson's certification was clearly erroneous because it was not supported by substantial evidence. The court also concluded that

5

the Hearing Examiner had allowed an unqualified witness, held out as an "expert," to "excuse obviously false and vindictive testimony to support OPI's refusal to renew Gerald Thompson's teaching certificate." The court further stated that the Hearing Examiner had used allegations of non-school related conduct--Hutchinson's allegations--to support that conclusion. The court stated that a review of the record left the court with the definite and firm conviction that a mistake and an injustice had been committed. The court held that Thompson's procedural and substantive due process rights had been violated by the actions of the Judith Basin County Attorney, on behalf of the School Board and OPI, and that such actions shocked the conscience of the court. The court further held that the admission of improper expert testimony deprived Thompson of the fundamental fairness mandated by due process.

OPI appeals the District Court's reversal of the Board's decision to this Court. The following quote from the Proposed Order of the Hearing Examiner aptly describes the seriousness of the case before us:

> Although the decision in this matter is as difficult as any I have made as a hearings examiner, there are certain things which are clear. From the testimony of numerous witnesses it is beyond refute that Mr. Thompson was a talented and respected teacher, coach and administrator. If the charges are untrue a high caliber professional has had his life's work ruined. However, if the charges are true he is a sexual predator who should not be in a position of power and authority with women and girls and the licensing agency would be remiss if it allowed Mr. Thompson to be licensed as a teacher.

Further facts are provided throughout this opinion as may be necessary for discussion.

ISSUE I

Did the District Court err in reversing the Order of the Board of Public Education based on the expert testimony provided by OPI's expert?

OPI presented a drug and alcohol counselor to provide testimony as an expert witness on sexual abuse. OPI's expert provided the only expert testimony at the hearing. Her testimony formed the basis for the Hearing Examiner's findings that Thompson attempted to have sexual relations with Killham on December 9, 1986, and with Hutchinson in 1987. As to the allegations made by K.W. and Mrs. Aamold, the Hearing Examiner determined that their allegations were not credible.

Although the testimony and the allegations of abuse made by both Killham and Hutchinson were fraught with inconsistencies and contradictions which the Hearing Examiner stated would seem to make them improbable, the examiner disregarded these inconsistencies based on the expert's testimony. The findings include the following statements concerning the drug and alcohol counselor's testimony as used by the examiner to support Killham's credibility:

> The stories of the two main complaining witnesses are troubled by inconsistencies and contrary evidence. However, OPI presented expert testimony that inconsistencies are part of the normal pattern of behavior for sexual abuse or sexual harassment victims. The expert is a counselor with extensive training in sexual abuse and extensive experience in counseling victims. I found her testimony credible.

>     .   .   .

> The inconsistencies begin immediately. [Killham's] letter to the school board . . . alleges that she was forced to actually perform oral sex with Mr. Thompson on that day. [The inconsistency is that at the time of hearing Killham testified that Mr. Thompson asked her to

7

perform oral sex but that she did not do so.]  The boys'
teams had played their first games of the season prior to
December 9.  It is illogical that Lisa would be getting
practice jerseys on December 9, since the jerseys would
have been handed out to the team members long before.
The teacher whom she testified interrupted the assault
has no recollection of going to the storage room and
finding Lisa and Mr. Thompson.  Mr. Thompson established
he went to his dentist's office that afternoon to receive
his allergy shot and was there for an hour or more . . .
This left very little time for the incident to occur.
The librarian, where Lisa was working as an aide around
the time of the incident recalls Lisa being very happy
and excited about her eighteenth birthday.  Lisa wrote a
note in Mr. Thompson's practice book that day, after the
incident was alleged to have occurred.  She wrote "Lisa's
B-day" and drew a happy face.

.

The inconsistencies would seem to make Lisa's
allegations improbable.  However, my interpretation of
the sexual abuse expert's testimony is that blocking out
abusive incidents from memory is a self-preservation
mechanism commonly employed by victims and that later
recollection tends to come back slowly and incompletely
and in a jumbled fashion, and that it is common for the
victim to put up a facade of normalcy.  This is logical
and consistent with Lisa's testimony.

.    .

Again, the sexual abuse expert testified victims
tend to be those who appear to be vulnerable and lacking
in self-esteem.  Lisa fits that profile. . .

The following statements by the Hearing Examiner relate to

Hutchinson's testimony:

Again there are inconsistencies.  Tammy stopped to see
Mr. Thompson at the school and at home on a later visit
to Hobson, making a point to introduce her friend from
college.  At a basketball game she sat with Mr. Thompson
and engaged in conversation the entire time.   This
behavior again fits that of an abuse victim. I find Mrs.
Hutchinson to be a very credible witness to which Mr.
Thompson's only response is that this did not happen when
she came to his house that night.  I find her testimony
true, and I find that the incident did occur.

Clearly, the assumption that these two young women were victims of

8

sexual abuse pervades the Hearing Examiner's findings and the conclusions. We emphasize that the conduct of Killham and Hutchinson as above-quoted, while it arguably may fit within the profile of victims, could also fit many other explanations. Other explanations for their behavior were not ruled out, nor were they addressed. Moreover, the incident alleged by Hutchinson, if true, occurred at Thompson's home and long after she graduated from high school. It is insufficient in itself to support the Board's action, and it was arguably inappropriate to use it to buttress the charge brought by Killham which the Hearing Examiner found had occurred.

The Hearing Examiner's conclusion that the abusive incidents occurred hinged on the drug and alcohol counselor's testimony as an expert on sexual abuse. The District Court concluded that the Hearing Examiner "improperly relied on concededly incredible testimony which was erroneously bolstered by inadmissible testimony of an unqualified expert." This conclusion raises two separate issues--whether the testimony was admissible and whether the expert was qualified to testify. For the reasons explained below, we conclude the Hearing Examiner erred in basing his decision on the inadmissible testimony and, therefore, we decline to address the qualification of the expert witness.

Standard of Review

On appeal, the District Court determined that OPI's expert had testified that the abuses alleged by Killham and Hutchinson had occurred and that her testimony should not have been admitted.

9

Like other decisions concerning the admissibility of evidence, a ruling on whether expert testimony is admissible is left to the discretion of the trial judge. State v. J.C.E. (1988), 235 Mont. 264, 269, 767 P.2d 309, 312; State v. Harris (1991), 247 Mont. 405, 410, 808 P.2d 453, 455. Similarly, the determination of whether a witness is qualified as an expert is left to the discretion of the trial judge, who has wide latitude in making such determinations. J.C.E., 767 P.2d at 312. Citing the general rule in Montana that experts may not testify on an ultimate issue, the District Court in this case determined that the ultimate issue was whether the alleged acts had occurred and that the expert had testified that the acts alleged really did occur, thereby invading the province of the trier of fact. See Heltborg v. Modern Machinery (1990), 244 Mont. 24, 29-33, 795 P.2d 954, 957-59.

### Was the expert's testimony admissible?

Admissibility of expert testimony in administrative proceedings is an issue which has not been thoroughly addressed by this Court. The Montana Administrative Procedure Act (MAPA), at § 2-4-612(2), MCA, provides that agencies are bound by common law and statutory rules of evidence, except as otherwise provided by statute relating directly to an agency. Often the hearing examiner in a formal contested case hearing will admit the evidence and will consider the weight to be given to such evidence when preparing findings and conclusions from all the evidence. Although the Rules of Evidence are generally more relaxed in an administrative proceeding than in a court of law, they are not to be relaxed to

10

the point of disregarding due process of law and the fundamental rights of the individual. Hert v. J.J. Newberry Co. (1978), 178 Mont. 355, 364, 584 P.2d 656, 661. While our discussion in this case draws on other areas of the law in reaching conclusions, our opinion is directed only to the administrative hearing process.

Although this case centers around the allegations of high school students, and the two incidents relied on by the Hearing Examiner involved an eighteen-year-old and a nineteen-year-old, our discussion is permeated with references to child sexual abuse without reference to age as that is how it was presented at the administrative hearing and argued in briefs in this Court by the parties and by amici curiae.

In a criminal case, the question whether a child is a victim of sexual abuse is a question that may be clarified by qualified expert testimony. Harris, 808 P.2d at 456. As a general rule, however, expert testimony evaluating the credibility of witnesses is not admissible. We have adopted an exception to this general rule in cases where the witness is a child victim of sexual assault, testifies at trial and credibility is brought into question. J.C.E., 767 P.2d at 312-13; Harris, 808 P.2d at 455. OPI relied on this exception to introduce otherwise inadmissible evidence to rebut the impeachment evidence provided by Thompson.

We have not addressed to an appreciable degree in the area of criminal law at what age such rehabilitative evidence is no longer appropriate and we have not indicated that it is appropriate to consider it up to and beyond the age of attaining majority. Most

11

of our cases addressing this subject involve young children. In State v. Donnelly (1990), 244 Mont. 371, 378, 798 P.2d 89, 93, however, we discussed expert testimony on credibility in relation to a victim who was fifteen years old at the time she testified, but who had been sexually abused prior to that time. In Donnelly, 798 P.2d at 93, an expert was allowed to provide testimony to rehabilitate the credibility of the victim.

In State v. Hensley (1991), 250 Mont. 478, 481, 821 P.2d 1029, 1031, the victim was a month shy of her seventeenth birthday when she testified that she had been abused over a five-year period. We concluded that admitting the expert testimony in Hensley was reversible error where the victim was sixteen years old, a competent witness and was under no physical or mental disability. Hensley, 821 P.2d at 1032. We reasoned that the jury was capable of assessing the credibility of such a witness without resort to expert assistance. If the present case were a criminal prosecution, no foundation had been laid which would warrant admission of expert testimony.

In our present case, the allegations were made to the School Board. Those allegations triggered criminal charges which were later dismissed. The charges were made by adults and by one minor, K.W., age sixteen in 1988 at the time she made the allegations. Although Killham was still in high school, she reached eighteen on the very day of the alleged act which the Hearing Examiner found had occurred. She made the allegations nearly two years later. The question then is whether there was a proper basis or foundation

12

for expert testimony in the present case to rehabilitate the credibility of the witnesses.

The cases which have come before this Court involving sexual abuse have raised difficult evidentiary questions. Harris, 808 P.2d at 456. Much of the litigation regarding such abuse has challenged the suitability of using experts' opinions to determine if a particular person was a victim of sexual abuse. It has involved issues of hearsay and whether the conduct exhibited by the alleged victim was consistent with conduct demonstrated by victims of sexual abuse in general. It has often related to the unavailability of the child victim for purposes of testifying, as well as the normally inadmissible out-of-court statements of very young children. In such cases, if the victim was unable to relate information about an alleged offense in a courtroom setting, crucial probative evidence may have been lost.

We have summarized the foregoing to emphasize that none of the foregoing applies in the present case. Here the grave danger by the admission of such expert testimony was demonstrated with clarity when the expert testified in general statements about delays in reporting abuse, recantations and inconsistencies in testimony of sexual abuse victims; and her general statements were relied upon by the Hearing Examiner. We emphasize here that, while the present case involved an administrative proceeding, the constitutionally protected interest of Thompson in his right to employment as a teacher was directly involved. At that point, the effect of inadmissible testimony becomes most significant. In

13

Harris, 808 P.2d at 456, we stated:

> While we recognize that expert testimony regarding the sometimes puzzling and seemingly contradictory behavior of victims of child sexual assault may aid the jury to determine ultimate issues, such as whether the crime actually occurred, we must be careful not to allow the witness to become a conduit for otherwise inadmissible testimony.

With regard to generalized credibility testimony as presented in the present case, the rationale for allowing expert testimony to explain delays in reporting or recantations of charges of sexual abuse by victims is that it provides reliable information which the trier of fact can use to assist in understanding evidence. While qualified experts possess specialized knowledge regarding certain aspects of credibility, their capacity to detect lying and coaching is too limited to justify admission of generalized credibility testimony. John E.B. Myers, Expert Testimony in Child Sexual Abuse Litigation, 68 Neb. L. Rev. 1, 127 (1989).

Thus, without an explanation, an expert's general statements that delays and recantations are common in victims of sexual abuse may prejudice the accused because the trier of fact may defer to the expertise of the expert in the field of child sexual abuse and infer that the expert believes the witness to be credible. This is exactly what happened in the present case. It is the reason that expert testimony on credibility is not permitted in most instances.

In addition to her testimony about delays in reporting abuse and recanting prior allegations of abuse, OPI's expert repeatedly testified, in reference to inconsistent testimony, that memory may be affected in that a victim's memory of the facts may be unclear,

14

garbled or blurred due to the trauma involved and the resultant shock used as a buffer by the victim. Again, we note that her testimony relates to victims of sexual abuse in general, not specifically child victims.

The **key** testimony by the expert here **was** that the inconsistencies in the testimony and the contrary nature of some of the testimony was explained by the alleged sexual abuse, yet the record indicates that other explanations for the inconsistencies are possible. Thompson's counsel objected to each of the hypothetical questions posed to the witness. He based some of the objections on lack of foundation and relevancy and had a continuing objection as well to the testimony **from** this expert witness.

As above cited, <u>Hensley</u> established that where a victim was sixteen years old, a competent witness, and under no physical or mental disability, it was reversible error to admit expert rehabilitation testimony. As we have indicated, the record here contains nothing to establish that any of the witnesses, all of whom were over eighteen years of age at the time of the hearing, were for some reason not competent as witnesses or were under any form of physical or mental disability. We therefore conclude that there was a failure to establish a foundation for the use of any expert **testimony** under <u>Hensley.</u> As a result, we hold that the testimony on the part of the expert was not admissible.

<u>ISSUE II</u>

Did the District Court err in concluding that the Order of the Board of Public Education was not supported by substantial credible evidence?

**15**

The Rules of Evidence were developed to assure that triers of fact formulate their decisions on reliable, probative and substantial evidence. MAPA acknowledges this concept in providing standards of review for administrative agency decisions in § 2-4-704, MCA. We have interpreted § 2-4-704, MCA, to mean that an agency's findings of fact are reviewed to determine whether they are clearly erroneous. Baldridge v. Rosebud County School Dist. #19 (1994), 264 Mont. 199, 205, 870 P.2d 711, 714. In addition, the court may not substitute its judgment for that of the Board as to the weight of the evidence on questions of fact. Baldridge, 870 P.2d at 717; § 2-4-704(2), MCA. In order to properly review the District Court's decision, we must review the Board's findings-- identical to those of the Hearing Examiner in this case--to determine whether they are supported by reliable, probative and substantial evidence in the record. Baldridge, 870 P.2d at 718, (quoting Trustees, Carbon County School Dist. No. 28 v. Spivey (1993), 262 Mont. 513, 521, 866 P.2d 208, 213).

The District Court determined that certain of the Hearing Examiner's findings and conclusions were not supported by substantial credible evidence when the expert's testimony was disregarded. OPI contends that the District Court had to substitute its judgment for that of the Hearing Examiner and reweigh the evidence on critical matters of fact in order to determine that the findings were not supported by substantial evidence and were thus clearly erroneous. We disagree.

Our holding in Issue I approved the District Court's ruling

16

that the Hearing Examiner had abused his discretion by considering the testimony of OPI's expert for any purpose. In the proper case, where there are no independent findings of fact to support the sort of action taken by the court here, further action on the part of the Board may be necessary. However, in this case, no purpose would be served by requiring the Board to hear the matter anew or to remake findings and conclusions consistent with the excision of the expert's testimony. The Board adopted all the findings and conclusions of the Hearing Examiner, and the findings and conclusions were sufficiently comprehensive so that the court could modify the Board's order, provided there is substantial evidence in the record to support them.

The District Court's Order contains sufficient detail of facts with references to the transcript and other evidence in the record so that this Court is able to determine that the District Court thoroughly reviewed the record. There are two critical findings which the District Court modified after disregarding the expert's testimony. The court reversed the findings of the Hearing Examiner which determined that the inconsistencies and contradictions in the testimony somehow made the claims of sexual misconduct credible, even though all other evidence pointed to the opposite conclusion. The first was the conclusion that the sexual misconduct incident alleged by Killham to have occurred on December 9, 1986, the day of her eighteenth birthday, did not occur. The other was that the allegation made by Hutchinson did not occur and was irrelevant to the issue of renewing Thompson's teacher certification.

17

The common thread in these findings is the impact of the expert's testimony:

> OPI presented expert testimony that inconsistencies are part of the normal pattern of behavior for sexual abuse or sexual harassment victims. The expert . is a counselor with extensive training in sexual abuse and extensive experience in counseling victims. I found her testimony credible.
>
> . .
>
> The inconsistencies would seem to make Lisa's allegations improbable. However, my interpretation of the sexual abuse expert's testimony is that blocking out abusive incidents from memory is a self-preservation mechanism commonly employed by victims and that later recollection tends to come back slowly and incompletely and in a jumbled fashion, and that it is common for the victim to put up a facade of normalcy. This is logical and consistent with Lisa's testimony.
>
> . . .
>
> . . . Lisa was also apparently preoccupied with romance and sexual matters and would tell anyone who would listen the most intimate information.
>
> Again, the sexual abuse expert testified victims tend to be those who appear to be vulnerable and lacking in self-esteem. Lisa fits that profile. Lisa's story of a December 9, 1986 assault is corroborated by three fellow students whom she told of the incident at the time. Lisa's testimony that Mr. Thompson got her out of class to perform managerial duties is consistent with past practice. Laurie Valentine's testimony that Lisa was very upset before practice is consistent with Lisa's testimony. Although Mr. Thompson accounted for a period of an hour or more, there was time for the incident to occur. I find Mr. Thompson had Lisa leave her class on December 9, 1986, on the pretense of performing a task in the equipment room and when he had gotten her to that room he attempted to force her to perform oral sex. Regardless of anything else I find this assault occurred.

One crucial item of testimony which the Hearing Examiner did not consider is that Thompson was teaching a boys physical education class during the class period when the incident allegedly occurred.

18

The Hearing Examiner determined that Thompson had accounted for his time during 6th period but did not consider the unrebutted testimony that he was teaching this class during 7th period.

The District Court did not reweigh the evidence pertaining to Killham's allegation. Instead, the court disregarded the testimony of the expert, was then left with the Hearing Examiner's finding that the inconsistencies seemed to make Killham's allegation improbable and considered the unrebutted probative evidence that Thompson was not free during Killham's 7th period when she claimed he took her from the library, and concluded that the reliable, probative and substantial evidence left in the record supported no other finding than that Killham was not a credible witness.

OPI contends the court could only reach this conclusion by determining first that Killham's testimony was not credible and then making the second determination that the testimony of Laura Valentine, Alynn Mikkelson and Amy Otchko Cummings was not credible. Valentine, Mikkelson and Cummings all testified that Killham told them about the alleged incident which occurred on her birthday, December 9, 1986. They all related substantively differing stories about what Killham had told them on that day. The Hearing Examiner used the testimony of these witnesses as evidence to corroborate Killham's claim that Thompson propositioned her on December 9, 1986.

The testimony of these three witnesses also contradicted Killham's testimony which was that she had told no one about the alleged incident. Numerous witnesses testified that Killham had a

19

"crush" on Thompson while she was in high school and that she was obsessed with things of a romantic and sexual nature and would relate the most intimate information to anyone who would listen. The core details of the stories Killham allegedly told these three girls differ. For example, Valentine testified that Killham told her she was forced to perform oral sex on Thompson; the others testified that she told them that Thompson had only asked her to do this. Mikkelson testified that Killham had also told her that she had been forced to perform oral sex on Thompson on an occasion when he drove her home after she had been babysitting his child. Not only did Killham testify that this did not occur, she also testified that she did not tell Mikkelson about this incident.

Valentine also testified about an encounter with K.W. shortly after the incident K.W. alleged had happened with Thompson in the summer of 1986. K.W.'s testimony pertaining to that event was that she had only told one person, Dawn Hall, about the incident, and that she had not related it to Valentine. The Hearing Examiner did not find Valentine's testimony credible with regard to K.W.'s accusations. However, this is the same sort of **testimony** the examiner found believable to support the finding that Killham's alleged sexual abuse incident on December 9, 1986 had occurred. This and other contradictions in the evidence are so prevalent throughout the testimony as to properly allow a conclusion that Killham's claim was thoroughly impeached. We conclude there is substantial evidence in the record for the court to find that Killham's claim was thoroughly impeached.

20

The District Court also determined that Hutchinson's claim was thoroughly impeached. First, Hutchinson claimed to be deeply traumatized by the alleged incident where she claimed Thompson, in his home, had tried to kiss her and had put his hand on her leg before she pushed him away. Yet, she repeatedly visited him thereafter and even brought a college friend to his office to meet him. The District Court determined that she had "embellished her claim further with a description of an alleged conversation with Killham shortly after the alleged Hutchinson incident (in Spring '87)." In relating her story that she contacted Killham right after that incident, she spoke of the incident in her testimony as if Killham had been out of high school at the time of their conversation when, in fact, Killham was still a senior in high school at that time. After the alleged incident of sexual misconduct made by Hutchinson, while home from college, Hutchinson also sat with Thompson for the duration of a basketball game and engaged in conversation the entire time.

The Hearing Examiner found Hutchinson to be a "very credible witness to which Mr. Thompson's only response is that this did not happen when she came to his house that night." The Hearing Examiner found that her behavior "fit that of an abuse victim."

The Hearing Examiner essentially stated that the testimony of Killham and Hutchinson was made credible after impeachment by the expert's testimony. As we have held above, the testimony of the expert concerning general statements about the behavior of victims of sexual abuse was error. The District Court correctly concluded

21

that the Hearing Examiner's findings that Hutchinson and Killham were victims of abuse are not supported by substantial evidence in the record.

The District Court reviewed the entire record to determine whether substantial evidence supported the Hearing Examiner's findings. Only by reviewing the entire record would the District Court have been able to come to the conclusions thoroughly outlined in the court's detailed order supporting the decision to reverse the Board's decision. The court looked for reliable, probative and substantial evidence as directed by § Z-4-702, MCA, to support them and found such evidence either lacking or not considered by the Hearing Examiner in forming his conclusions. When the expert's testimony is properly disregarded, the other findings of the Hearing Examiner do not support a conclusion that Thompson is not of good moral and professional character.

Because the Hearing Examiner's findings and the Board's order were based on improper evidence in the form of expert testimony and the clearly erroneous findings that Killham's and Hutchinson's allegations were true because their credibility was restored, the Board's order cannot stand. The Hearing Examiner's findings and conclusions in this case contain sufficient independent statements from which the District Court could reverse the Board's decision without requiring new findings and conclusions from the record.

We hold the District Court did not err in concluding that the Board's decision was not supported by substantial credible evidence and should be reversed.

Affirmed.

_/s/ _____
                        Justice

We Concur:

_/s/ J. A. Turnage_____
            Chief Justice

_/s/ _____

_/s/ _____

_/s/ _____

_/s/ William E. Hunt_____
                        Justices


Justice W. William Leaphart did not participate in this decision
because he was not on the Court at the time of its submission.


23

March 23, 1995

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


KATHLEEN F. HOLDEN
Special Assistant Attorney General
P.O. Box 202501
Helena, MT 59620-2501

Torger S. Oaas
Attorney at Law
P.O. Box 76
Lewistown. MT 59457

Elizaderm A. Best
BEST LAW OFFICES, P.C.
Box 2114
Great Falls, MT 59403-2114

HON. JOSEPH P. MAZUREK, Attorney General
Kimberly A. Kradolfer, Assistant
215 N. Sanders
Helena, MT 59620

Douglas F. Bates
Attorney at Law
250 East 500 South
Salt Lake City, UT 84111

ED SMITH
CLERK OF THE SUPREMECOURT
STATE OF MONTANA

BY:_____
Deputy